Filed 6/13/25  R.U. v. Superior Court CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| R.U.,<br><br>Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF FRESNO COUNTY,<br><br>Respondent;<br><br>FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Real Party in Interest. | F089512<br><br>(Super. Ct. Nos. 24CEJ300158-1 & 24CEJ300158-2)<br><br>**OPINION** |

THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Kim Nystrom-Geist, Judge.

Fresno Dependency and Heather A. Von Hagen for Petitioner.

No appearance for Respondent.

---

[*]     Before Franson, Acting P. J., Meehan, J. and DeSantos, J.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

Father, R.U. (father), seeks an extraordinary writ (Cal. Rules of Court, rule 8.452)[1] from the juvenile court's order setting a Welfare and Institutions Code section 366.26[2] hearing for July 7, 2025, as to his daughters, now three-year-old E.U. and two-year-old A.U. (collectively the children). Father's petition challenges jurisdiction, arguing the jurisdictional findings are not supported by substantial evidence and the juvenile court erred in denying his motion to dismiss the petition under section 350, subdivision (c) and sua sponte amending one count of the petition to conform to proof. The petition also requests a stay of the section 366.26 hearing. Finding no merit to father's arguments, we deny the petition and his request for a stay.

## FACTUAL AND PROCEDURAL BACKGROUND

The children and their mother, S.P. (mother), came to the department's attention on September 17, 2024, when it received a referral that mother was transported to the hospital with blunt force trauma to her head and the children were at the hospital with her. Mother was highly intoxicated and extremely uncooperative, and while mother's sister reportedly was coming to pick up the children, she had not arrived. The reporting party contacted the police, who placed a hold on the children because mother could not make a plan of care for the children. The person identified as mother's sister was a friend, not a sister. The officer did not feel comfortable releasing the children to her, as the friend did not know the children's last names or their dates of birth.

Mother was released from the hospital the following day. A social worker spoke with mother, who stated that father was in prison, and they were not communicating with

---

[1] All further rule references are to the California Rules of Court.

[2] Undesignated statutory references are to the Welfare and Institutions Code.

each other due to a no-contact criminal protective order. Mother said father had been in jail for over a year. She denied being in a relationship with him, but she later told the social worker father possibly attempted to contact her via telephone and letter, but she did not respond as she did not want to get into trouble for contacting him.

Mother, who lived on her own in an apartment with the children, denied having an issue with drugs and claimed she only drank occasionally. When asked about her support system, mother stated she did not speak with maternal grandmother, and her circle of support included her friend and her brother (maternal uncle). Maternal uncle did not feel comfortable taking the children in as a relative placement. Mother did not have any other siblings. Mother claimed that father was gang affiliated and part of the Bulldogs gang. Mother shared that gang associates retaliated against her by destroying her vehicle as they blamed her for his arrest.

An emergency response child and family team meeting was held on September 19, 2024. Mother stated that neither maternal grandmother nor maternal uncle wanted to be involved with her or the department, and her friend was her only support. The department decided that the children, who were placed together in a licensed foster home, would remain in out-of-home care and a petition was filed on their behalf. Mother tested positive for cocaine that day.

***The Petition and First Amended Petition***

A dependency petition was filed on September 19, 2024, alleging the children came within the provisions of section 300, subdivision (b)(1) (failure to protect), based on mother's substance abuse that negatively affected her ability to care for the children (count b-1), and subdivision (g) (no provision for support), based on father being incarcerated and unable to arrange care for the children (count g-1). The petition further alleged that father was a presumed father, and the children lived with mother before department intervention. The social worker attempted to notify father of the detention

hearing on September 20, by calling the prison and sending emails to the prison's litigation department.

A first amended petition was filed the following day. It added an allegation that prior to the department's intervention, the children resided with father as well as mother. It also added factual allegations on count b-1 that mother refused to participate in a drug test for the department, she admitted she smoked marijuana when she drank alcohol, and she tested positive for cocaine.

***The Detention Report and Detention Hearing***

The report prepared for the detention hearing stated that mother and father were married on June 10, 2021. The department considered father to be the children's presumed father as he was listed on their birth certificates. Father had a criminal history dating back to May 24, 2023, with charges including assault with a firearm, discharge of a firearm at an occupied dwelling, and child endangerment. According to Fresno County records, on that day father fired rounds at the apartment where mother and the children were located, and father was arrested and convicted of the crime. A three-year criminal protective order, which was attached to the report, was issued on July 26, 2024, with father as the restrained party and mother and the children, and another adult, as protected persons (the protective order). Among other things, the protective order: (1) prohibits father from obtaining the addresses or locations of protected persons or their family members, caretakers, or guardians unless good cause exists otherwise; (2) prohibits him from contacting the protected persons directly or indirectly, by any means, or through a third party; and (3) orders him to stay at least 100 yards away from the protected persons and their homes.

The social worker reviewed a police report for a call for service on May 24, 2023, regarding 15 shots fired at an apartment. It appeared that mother had about eight adults, some of whom were friends and others who were strangers, over at her apartment to drink and hang out, with the children in the apartment. Father and his stepbrother came to the

4.

door and pointed a gun toward mother and began firing several times into the apartment. One of the children reportedly was nearly hit by the bullets fired toward the apartment. During the investigation, it also was determined that rounds were fired from inside the apartment in what was claimed to be self-defense. Father and other participants in the shooting were arrested that day.

At the September 20, 2024 detention hearing, the juvenile court directed the department to undertake family finding as soon as possible. Father was not present at the hearing, but an attorney was appointed for him. The court found the department used reasonable efforts to contact father, who was in prison custody, to provide notice to him. The court understood that his attorney represented that because father was the noncustodial parent on the day of removal, father would like custody and to provide a plan of care for the children. The court ordered the children removed from the home of mother and father, granted mother reasonable supervised visits, granted the department discretion for supervised and up to liberal visitation with any approved relatives or mentors, and denied father visitation due to the protective order. A combined jurisdiction/disposition hearing was set for October 23, 2024.

*The Jurisdiction/Disposition Report*

The department completed a jurisdiction/disposition report for the October 23, 2024 hearing. The department recommended that the first amended petition's allegations be found true, the children remain in out-of-home care and mother be given reunification services. The department further recommended that father not be provided placement of the children under section 361.2, subdivision (a), and that he be denied reunification services pursuant to section 361.5, subdivisions (b)(12) and (e)(1).

The report provided additional information about father's charges stemming from the May 24, 2023 shooting incident, which included shooting at an inhabited dwelling, attempted murder, child abuse and endangerment, assault with a firearm, three charges of discharge of a firearm at an inhabited dwelling, and two charges of false imprisonment.

5.

Father initially pled not guilty to the charges, but on June 20, 2024, he withdrew his not guilty plea and pled nolo contendere to charges of assault with a firearm on a person, discharge of a firearm at an inhabited dwelling, and two counts of false imprisonment with violence, and admitted a Penal Code section 12022.5, subdivision (a) enhancement. The other charges were dismissed.

On July 26, 2024, father was sentenced to state prison for a total term of seven years. The protective order was issued the same day, which protected mother and the children from father. According to prison records, father was incarcerated at Wasco State Prison, which he entered on August 12, 2024, and he may be eligible for parole in May 2028.

Attached to the department's report are the Clovis Police Department's report of the September 17, 2024 encounter with mother in the hospital and the following documents in father's criminal case: (1) Fresno Police Department reports of the May 24, 2023 shooting incident; (2) the May 26, 2023 felony complaint; (3) the felony advisement, waiver of rights, and plea form, showing father agreed to plead no contest to assault with a firearm, discharge of a firearm at an inhabited dwelling, and two counts of false imprisonment, and to admit a Penal Code section 12022.5, subdivision (a) enhancement, pursuant to *People v. West*;[3] (4) the minute order from the June 20, 2024 hearing when father's change of plea was taken; (5) the minute order of the July 26, 2024 sentencing hearing; and (6) the felony abstract of judgment.

A social worker spoke with paternal grandfather on September 25, 2024. Paternal grandfather believed father was in prison because mother provoked him by sending him pictures of her with other guys who had firearms while the children were in the apartment. Paternal grandfather asserted law enforcement simply believed everything mother said and now father was in prison. Paternal grandfather acknowledged father

---

[3]     *People v. West* (1970) 3 Cal.3d 595.

should have contacted law enforcement to respond to the situation, but instead he went to mother's apartment after she provoked him. Paternal grandfather requested placement of the children and was provided with the Resource Family Approval (RFA) orientation link to start the placement process. The department was assessing paternal grandfather and his wife for placement.

Mother told the social worker she and father lived together until April 2023, when they broke up and father moved out. Father was home most days after the children were born and he often interacted with them, including feeding the children and changing their diapers. After the breakup, father visited the children once a week until the shooting. He picked the children up and dropped them off with paternal grandparents, who took care of the children while father was away. The visits occurred two or three times prior to the shooting and lasted about a day and a half. Father's contact with the children ended after the shooting and father's arrest.

The social worker attempted to obtain a statement from father but was unable to contact him through prison officials. The department considered whether to place the children with father as the noncustodial parent, but the social worker opined it would be detrimental to do so. Father had been incarcerated since May 2023 because he shot at the apartment where mother and the children were present, there was an active protective order protecting the children from father which would not expire until July 26, 2027, and father was not eligible for parole until May 2028. Therefore, father would be incarcerated longer than the reunification period to which he was entitled, and it would be unsafe to place the children in his care.

Mother had been participating in supervised visits with the children. On October 15, 2024, a social worker informed paternal stepgrandmother that paternal grandfather's background check had been completed and supervised visits would be scheduled with paternal grandparents.

A family reunification panel was held on October 15, 2024, to discuss the appropriateness of providing father reunification services. Father met the criteria for denying services under section 361.5, subdivision (b)(12)[4] as he was convicted of a violent felony listed in Penal Code section 667.5, subdivision (c), namely, assault with a fireman (Pen. Code, § 245, subd. (a)(2)), with a firearm enhancement under Penal Code section 12022.5, subdivision (a). Father also met the criteria for denial of services under section 361.5, subdivision (e)(1),[5] as father was incarcerated and providing services would be detrimental to the children. The panel asserted reunification with father would not be in the children's best interests.

*A Contested Hearing is Set*

Father appeared at the October 23, 2024 hearing via Zoom with his attorney present in court. Mother and her attorney also were present. The juvenile court granted father's attorney's request to continue the hearing so father could receive the department's report, and the attorney could review the report with father.

Mother's attorney asked that the children not be placed with paternal relatives. Mother particularly objected to placement with paternal grandfather, paternal aunt, and father's mentor, as she had concerns about all of them. Mother did not have anyone who would be able to accept placement, and she was fine with the current care provider. The juvenile court noted mother's concerns and directed the department to provide the assessment required by law of any relatives or mentors who are seeking placement.

---

[4] Section 361.5, subdivision (b)(12) provides that reunification services need not be provided to a parent when the court finds by clear and convincing evidence that the parent has been convicted of a violent felony as defined in Penal Code section 667.5, subdivision (c).

[5] Section 361.5, subdivision (e)(1) provides that if a parent is incarcerated, "the court shall order reasonable services unless the court determines, by clear and convincing evidence, those services would be detrimental to the child."

Mother waived her right to a contested jurisdictional hearing and submitted on the report. The court continued the jurisdiction hearing to November 13, 2024. The hearing was continued to December 9, 2024, however, when father was not transported to the November 13 hearing.

Mother was killed on November 22, 2024. In the addendum report for the December 9, 2024 hearing, the department confirmed her death. The department continued to request that counts b-1 and g-1 be found true and continued to recommend that father not be provided placement under section 361.2, subdivision (a), that he be denied reunification services, and that a section 366.26 hearing be set.

The department provided information about the assessment of paternal grandparents for placement and the children's visits with them. Paternal grandparents passed the RFA home assessment requirements and were approved for placement.

The children had supervised visits with paternal grandparents on November 1 and 22, 2024. At the first visit, the children were uncomfortable around paternal grandparents and did not appear to trust them for comfort. At the second visit, the younger child clung to the social worker at the outset of the visit and did not want to interact with paternal grandparents. While she eventually interacted with them, at the end of the visit she did not want grandfather to pick her up and both children were resistant to giving grandfather a hug.

The social worker met with paternal grandparents on November 22, 2024, and told them the department would continue to assess them for placement despite mother's death. Paternal grandparents were aware of the protective order. They stated father needed to learn and they did not agree with what father did. The social worker asked them who was more to blame for endangering the children when father was arrested. Paternal grandfather stated mother sent pictures of other guys in the house holding guns while the children were there, and "[m]y son being a kid like he is, not thinking right, and they got into an incident over there," and "he went over there with friends, and people were

9.

shooting." Paternal grandfather said: "If it was my kids I would have done the same thing at [father's] age." Paternal stepgrandmother added that they did not approve of what father did, but father knew better now. Paternal grandfather stated father should have called the police or done something else, and grandfather began reciting information from the police report regarding mother sleeping with different people in the home.

The social worker asked paternal grandparents to assign a percentage of blame to each parent, clarifying that father opened fire into the apartment with the children inside after mother sent pictures of people with guns. Paternal grandparents considered them to be equally at fault. They only knew what was on the police report, which was that mother was aggravating father.

Three days later, the social worker told paternal grandparents the department would not be placing the children with them. There were two primary contributing factors to this decision: (1) the children's discomfort with them at the start of two supervised visits, and the younger child's discomfort with grandfather when visits ended; and (2) that paternal grandparents assigned equal blame to the parents for placing the children in danger the night father was arrested. This was a concern because it showed grandparents' inability to assess risk of harm and danger for the children, as father's act of firing a gun into the home was more dangerous than mother keeping bad company and antagonizing father.

Paternal stepgrandmother denied saying that the blame was equally shared and insisted she stated father had been more at fault. Paternal stepgrandmother stated they had not seen the children for over a year, and it made sense the children would forget about them. The social worker responded the concern was not the lack of relationship between paternal grandparents and the children, but rather the children's negative response toward them that the social worker had not observed with other people.

The social worker explained in the report that while paternal grandparents had appropriate space in their home, it was unclear if they could make appropriate decisions

when identifying safe relationships for the children or whether father had made appropriate and significant changes to safely be allowed around the children. Not only did paternal grandparents assign equal fault to both parents, they also were actively working with father to navigate the court system to remove the protective order. Moreover, paternal grandfather appeared to negatively impact the younger child, and to a lesser extent the older one, during visits.

At the December 9, 2024 hearing, mother's attorney reported mother's death. The department was assessing maternal relatives for placement. Father's attorney stated that father was not present at the hearing because the prison did not get a copy of the transportation order. The attorney asked to set the matter for trial.

Mother's attorney asked to be relieved as mother's counsel due to her death, but asked to state mother's positions for the court's consideration. Mother objected to placement with paternal relatives, as she did not believe the children would be safe with them. Her attorney did not have any guidance from mother about placement with the maternal family, but mother wanted the children to remain with the current care provider until mother reunified. After the juvenile court relieved mother's attorney, it set a settlement conference for January 22, 2025, and a contested jurisdiction/disposition hearing for January 24, 2025.[6]

### *The Jurisdiction and Disposition Hearing*

Father subsequently filed a statement of contested issues, a witness list, and objections to hearsay. Father listed the following as issues: (1) taking jurisdiction was unnecessary as father could make suitable arrangements for the children's care and the children were no longer at risk of harm from mother due to her death; (2) the children should not be removed from father because he could arrange a long-term plan of care for

---

[6] The juvenile court also set a hearing for December 18, 2024, to determine whether the children's care provider should be granted de facto parent status. At that hearing, the court granted the care provider's request and appointed an attorney for her.

11.

them with paternal grandparents; (3) the children should be placed in father's care pursuant to section 361.2 because placement would not be detrimental; and (4) father had a due process right to cross-examine witnesses in the department's records. Father also argued that if the court took jurisdiction over the children and removed them from father's care, they should be placed with paternal grandparents.[7]

At the January 22, 2025[8] settlement conference, the juvenile court reviewed father's witness list and struck some witnesses as irrelevant or unnecessary. The court confirmed the matter for a contested hearing on January 24.

The department filed a second amended petition on January 23. This petition added a notation that mother was deceased and a count g-2 allegation under section 300, subdivision (g), which stated: "The children … have been left without any provision for support in that the mother [] is deceased and is unable to provide a plan [of] care for the ongoing care and support of her children."

The jurisdiction/disposition hearing began on January 24, with the juvenile court first addressing jurisdiction. Father was present in court. Father's attorney acknowledged receiving the second amended petition and denied all allegations. The department submitted on the second amended petition, the jurisdiction/disposition report, the addendum report, and the detention report, and rested subject to rebuttal. Minors' counsel also submitted on the department's reports and recommendations.

Father's attorney made a motion to dismiss the second amended petition under section 350, subdivision (c), arguing the department failed to meet its burden of proving the petition's allegations were true. The attorney argued count b-1 should not be found true because mother passed away before the court took jurisdiction. On count g-1, the

---

[7] Father's attorney added his request that the children be placed with paternal grandparents pursuant to section 361.3 to the list of issues at the January 24, 2025 hearing.

[8] Subsequent references to dates are to the year 2025 unless otherwise stated.

12.

attorney asserted that while father was incarcerated, he was able to make a plan of care for the children with paternal grandparents until his release from prison and the protective order expired. As for the newly added count g-2, the attorney asserted there was no need to take jurisdiction because father was asserting his parental rights to create a viable plan for the children's care, and it would be inappropriate to take jurisdiction simply because one parent was deceased. The attorney asked the court to dismiss the petition and place the children with paternal grandparents.

County counsel submitted on counts b-1 and g-1. As for count g-2, county counsel asserted the amendment was filed because there was no plan of care for the children when mother died. Based on that fact, county counsel maintained that detention was necessary, and jurisdiction was appropriate. Accordingly, county counsel asked that the court find count g-2 to be applicable and deny the motion.

The juvenile court denied the motion, finding the department made a prima facie showing and established the facts necessary to bring the children under the court's jurisdiction. The court noted it was undisputed that father was subject to a protective order with the children as protected parties. The court reviewed the details of the May 24, 2023 shooting at mother's apartment which the police discovered during the investigation, quoting from a police detective's report.[9] The court explained that while

---

[9] The detective's narrative stated the investigation determined: mother had been separated from father for about one month; mother was inside her residence with her children and three female friends and three male acquaintances; the victims heard a voice at the door saying to open the door; when mother and another person opened the door they saw father, who the police believed arrived there because he was jealous mother was congregating with other males, and another person there possessing firearms equipped with lasers, with the lasers pointed at mother and the other occupants; mother and the other occupants pleaded with father and the other person not to shoot but father continued to point the firearm at the victims, who retreated inside the residence; multiple shots were fired towards the inside of the residence, but the victims were able to find cover and were not struck by the gunfire; and the gunfire struck multiple residences, including mother's apartment.

13.

father wanted to make decisions about his children, the evidence showed the children were inside the home when he shot into it. The court cited to other documents from father's criminal case.

The juvenile court found the department provided adequate evidence to establish count g-1, as father was incarcerated and could not arrange for the children's care. The court explained the department's evidence provided overwhelming proof that father fired a gun into the home where mother and the children were, there was a judicial finding that father could not be around the children, and father was required to comply with the protective order. The court determined the department's evidence as to father only was sufficient to overcome the section 350, subdivision (c) motion. The court also noted mother was deceased, so it was impossible for the children to be in her care. Accordingly, the court denied the motion.

Father's attorney objected to the denial of the motion, referencing *In re S.V.* (2022) 86 Cal.App.5th 1036, which the attorney asserted held a court violated a mother's due process rights because dependency jurisdiction was established based on a parent's conduct when the social services agency never alleged that parent was an offending parent and the jurisdiction finding was based on a factual legal theory not raised in the agency's petition. The attorney asserted the juvenile court denied father's motion based on legal theories and facts that were not raised in the department's petitions and noted father's felony waiver of rights was based on *People v. West*.[10] The juvenile court noted

---

[10] A *West* plea is " 'a plea of nolo contendere, not admitting a factual basis for the plea,' " which "allows a defendant to plead guilty in order to take advantage of a plea bargain while still asserting his or her innocence." (*People v. Rauen* (2011) 201 Cal.App.4th 421, 424; see *In re Alvernaz* (1992) 2 Cal.4th 924, 932.)

When a defendant changes his or her plea to guilty or no contest, " 'the plea is deemed to constitute a judicial admission of every element of the offense charged,' " and " 'serves as a stipulation that the People need introduce no proof whatever to support the accusation: the plea ipso facto supplies both evidence and verdict.' " (*People v. Voit* (2011) 200 Cal.App.4th 1353, 1363.)

the objection and invited father to call his first witness or proceed with an opening statement.

Father's first witness, Alexander Flores, the emergency response social worker who worked on the case from September 17, 2024, to September 25, 2024, testified he attempted to contact father through prison officials, but was never able to speak with him. Flores spoke with paternal grandparents on September 25, 2024, when they contacted the department to request placement of the children. An initial assessment was conducted, but paternal grandparents were referred to the RFA process because there were concerns concerning their statements about the May 2023 shooting. Flores did not attempt to contact other paternal family members. The petition contained the count g-1 allegation as to father because the social worker was unable to contact him, and concerns were raised during the investigation.

Father testified that prior to his incarceration he and mother shared custody of the children and there were periods when the children lived with him. Father claimed he and mother agreed paternal grandparents would care for the children if something happened to them. Father also claimed that as of September 2024, he could have made a plan of care for the children by placing them with paternal grandparents. Father provided information to the department about individuals he believed could make a plan of care for the children—his sister, paternal grandparents, and a childhood friend he considered a brother. No social worker spoke with him about making a plan of care for the children. Father understood the protective order prohibited him from having contact with the children, but he could make a plan of care that would respect the order's terms. Father believed the court issued the protective order due to his incarceration and "what I was charged with and due to the fact that it endangered my family."

Paternal stepgrandmother testified she was willing to provide a plan of care for the children. She was aware of the protective order, which she said she would respect if the

children were placed with her. She was willing to maintain the girls in her home until they reached the age of majority.

Father's attorney rested and argued it was unnecessary to take jurisdiction, as none of the counts should be found true, since there was no longer a risk of harm from mother due to her death, and father could make a plan for his children through paternal grandparents. The attorney asserted that while father was temporarily prohibited from having contact with the children, he was able to arrange a plan with responsible adults who would provide day-to-day care and there was no indication this was not a viable plan. The attorney asked the juvenile court to dismiss the petition. Minors' counsel and county counsel submitted without argument.

The juvenile court found the second amended petition's allegations true, although it amended the count g-1 allegation according to proof. As to the counts pertaining to mother, the juvenile court found count g-2 true, as there was no dispute mother was deceased, and count b-1 true based on the evidence in the department's reports.

The juvenile court amended count g-1 according to proof to provide: "The children … have been left without any provision for support. The father … is incarcerated and cannot arrange for the care of the children in that the criminal court has ordered that the children be protected from the father by issuing a criminal protective order in case F23903941. And further, the father fired multiple shots into a residence in which the children were located placing them in immediate danger."

The juvenile court cited mother's statement to a police detective concerning the shooting incident and her relationship with father, which included stating that she and her older child were nearly hit by the bullets fired at them. The court cited evidence that relatives interfered with the investigation. The court further noted the addendum report addressed father's ability to make a viable plan of care, namely, to place the children, with whom he was prohibited from communicating, with paternal grandparents. Paternal grandparents, however, indicated they believed mother—the shooting victim—was

16.

equally at fault for the shooting, and paternal grandfather stated father was not thinking right and if those were his kids, he would have done the same thing at father's age. Accordingly, the juvenile court found the department had proven count g-2 as amended.

The juvenile court therefore found the petition true as amended and the children were described by section 300, subdivisions (b) and (g).

Turning to disposition, the department submitted on the reports. Father's attorney called two social workers, paternal grandfather, and father to testify. Social worker Flores confirmed paternal grandfather requested placement of the children on September 25, 2024. Flores did not mention visitation to paternal grandfather when they spoke because Flores believed further assessment was needed as paternal grandfather stated the parents were equally at fault for the shooting and mother provoked it.

Hector Palmeno, a family reunification unit social worker, testified about paternal grandparents' visits with the children and the department's position on placing the children with them. The children had not been placed with paternal grandparents because it did not appear the children had a relationship with them that would benefit the children and Palmeno questioned paternal grandparents' ability to be protective due to their assessment of the altercation between mother and father, namely, that they did not see father being primarily at fault for endangering the children when he shot into the home.

Paternal grandfather testified about his request for placement of the children and father's relationship with them. When paternal grandparents' visits began in November 2024, they had not seen the children since July 2023. Paternal grandfather, who only knew what he read in the police report, understood that on the day of the shooting, father went to mother's home to get the children because men were there with guns. Paternal grandfather believed mother played a role in exposing the children to risk because the children were unattended and there were strange men in the home with weapons. He believed father placed his children in a dangerous situation because he should not have been there to confront anyone and should have called the police. Paternal grandfather

was aware of the protective order prohibiting contact between father and his children, and he would respect the order if the children were placed with him. He denied telling the social worker that mother was equally at fault and claimed he stated that both mother and father played a part, and both should be held accountable, as both were wrong and put the children in danger.

Father testified about his relationship with mother. After they separated at the end of April 2023, he moved into paternal grandparents' house and had the children in his care part of the time. Father, who denied being a gang member, claimed he went to mother's house on the day of the shooting because mother sent him a picture of a stranger holding a gun that was taken inside mother's apartment. Father wanted to get the children and take them home because he thought they could be in danger. He did not intend to engage in violence.

Father denied that he or anyone with him approached the apartment with guns drawn or that he fired a gun into the apartment. Father said he knocked on the door and the window and asked if he could get the children, but shots were fired from inside the apartment. Father admitted placing the children at risk by going to the apartment to get them and he took full blame because he should not have been there.

Father testified that if the court allowed him to have custody of the children, he would designate paternal grandparents as their care providers during his incarceration and the restraining order's existence. Father believed he did not pose a risk to the children's safety because he learned from his mistakes and had changed.

After argument from the parties' attorneys on February 20, the juvenile court set March 10 to announce its ruling. At the March 10 hearing, the court found the department made adequate and appropriate efforts to communicate and engage with father. The court overruled father's hearsay objections lodged under section 355 because they did not identify specific hearsay, he never identified any witness he wished to call regarding hearsay, and the hearsay was not considered for an ultimate fact.

The juvenile court found that father's argument that he was a custodial parent failed because he had not had contact with the children for over a year, the children were not residing with him or residing according to his direction, and he was prohibited from having contact with them or being around them.

The court addressed father's argument that as a noncustodial parent, he was entitled to placement under section 361.2. The court explained the issue was not father's unavailability due to his incarceration, but rather whether his conduct was incompatible with parenthood, which conduct led to his incarceration and the protective order. The court found father was not credible and the department's evidence was more credible and believable. The court found that if father were out of custody, he would not be an appropriate person to be with the children. This was because he acted in a manner incompatible with parenthood by shooting into a residence where his children were in the commission of a felony, which led to his plea and admission of personal use of a firearm. The court found it would not make sense to grant father the ability to decide who would care for his children and what their address would be when he was ordered to stay at least 100 yards away from them and their home, and to take no action to obtain their address or location.

The juvenile court denied paternal grandparents' request for relative placement under section 361.3. The court explained their request for custody "utterly fails" because they were unable to recognize that father was in prison due to his actions and choices, they justified and rationalized his actions while primarily blaming mother, and they did not recognize the danger father presented. Instead, they were working with him to remove the protective order. Thus, paternal grandparents were unable to provide a safe, secure, and stable environment for the children.

The juvenile court ordered the children removed from mother and from father should he be considered a custodial parent. If the court correctly found father was a noncustodial parent, the court found there was clear and convincing evidence it would be

detrimental to place the children with him and placement with paternal grandparents was inappropriate. After argument from the parties about whether to grant paternal grandparents continued visitation, the court stated it did not find any benefit to the children of continuing contact with paternal grandparents and contact would be detrimental to the children. Consequently, the court terminated their visits with the children.

The juvenile court made the children dependents, removed them from mother and father, if he was considered a custodial parent, found contact between father and the children would be detrimental, denied father reunification services under section 361.5, subdivisions (b)(12) and (e)(1), and set the section 366.26 hearing for July 7, 2025.

## DISCUSSION

Father challenges only the juvenile court's jurisdictional findings. He contends the juvenile court should not have taken jurisdiction over the children because: (1) the juvenile court erroneously denied his motion under section 350, subdivision (c) to dismiss the second amended petition; (2) the juvenile court erred in sua sponte amending count g-1 to conform to proof; and (3) the jurisdictional findings are not supported by substantial evidence.

## I.      Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence. " 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations] ' "[T]he

20.

[appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence ... such that a reasonable trier of fact could find [that the order is appropriate]." ' " ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

" 'Substantial evidence is evidence that is "reasonable, credible, and of solid value"; such that a reasonable trier of fact could make such findings.' " (*In re S.A.* (2010) 182 Cal.App.4th 1128, 1140; see *In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393–1394.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or order." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

## II.     Jurisdiction Under Count G-2

We first address section 300, subdivision (g), which provides for jurisdiction of a child if: "[(1)] The child has been left without any provision for support; [(2)] physical custody of the child has been voluntarily surrendered pursuant to Section 1255.7 of the Health and Safety Code and the child has not been reclaimed within the 14-day period specified in subdivision (g) of that section; [(3)] the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child; or [(4)] a relative or other adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child, the whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful."

None of the four statutory criteria for establishing dependency under section 300, subdivision (g) trumps any other. (*In re E.A.* (2018) 24 Cal.App.5th 648, 662.) Section 300, subdivision (g) applies, in the first instance, when a parent does not arrange for a child to be cared for by another, for instance, when a child has been abandoned. (*Ibid.*) Here, the second amended petition alleged under count g-2 that the children had been "left without any provision for support in that the mother … is deceased and is unable to provide a plan of care for the ongoing care and support of her children."

21.

The evidence is clear that mother could not provide a plan of care for the children because she died. Father does not contend otherwise. Instead, he contends the juvenile court should not have found this count true because, as the children's presumed father, he was entitled to custody of them, citing Family Code section 3010,[11] including the right to make a plan of care for the children if he were unable to care for them himself. He asserts he would have retained custody of the children if the department had not initiated dependency proceedings and claims that where two living parents have intact parental rights, the department should not be allowed to "orchestrate the juvenile court taking jurisdiction by claiming that one parent died without a plan of care." He argues that since this proceeding was instituted due to mother's substance abuse and she no longer posed a risk to the children due to her death, count g-2 should not have been found true.

As the juvenile court found, although father's parental rights were still intact, he was a noncustodial parent because the children were not living with him during these proceedings. Therefore, even if father could make a plan of care for the children, the juvenile court could take jurisdiction over the children due to mother's inability to arrange care for the children due to her death. The issue then is whether father, as a noncustodial parent, should be given placement of the children under section 361.2.

After a juvenile court asserts dependency jurisdiction over a child under section 300, it considers the child's disposition, including placement. (§ 358, subd. (a); rules 5.684(f), 5.690.) When a juvenile court orders removal of a child pursuant to section 361, section 361.2 requires the court to "first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires

---

[11] Family Code section 3010 provides, in pertinent part: "(a) The mother of an unemancipated minor child and the father, if presumed to be the father under Section 7611, are equally entitled to the custody of the child. [¶] (b) If one parent is dead … the other parent is entitled to custody of the child."

to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a); *In re John M.* (2013) 217 Cal.App.4th 410, 420; *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1829 [a finding of detriment pursuant to § 361.2, subd. (a) must be made by clear and convincing evidence].)

A parent with whom the child was not residing when dependency is initiated, whether or not due to a family law custody order, is presumptively entitled to custody because that parent has not been previously found to pose a risk of harm to the child. (*In re A.A.* (2012) 203 Cal.App.4th 597, 610.) The fact that the noncustodial parent is incarcerated will not by itself support a finding of detriment if "the parent is able to make appropriate arrangements for the child's care during the parent's incarceration and placement with the parent is not otherwise detrimental to the child." (*In re John M.*, *supra*, 217 Cal.App.4th at p. 423.)

Thus, under section 361.2, if father were a fit parent and able to arrange care for the children, the juvenile court could have placed the children with him, allowed him to arrange for their care, and terminated dependency jurisdiction. (§ 361.2, subd. (b)(1).) The court, however, denied father's request for placement because it would be detrimental to the children as father acted in a manner that was incompatible with parenthood when he used a firearm against his children in the commission of a felony and he could not make a plan of care for the children since the protective order required him to stay at least 100 yards away from the children and their home, and prohibited him from taking any action to obtain their address or location. Father does not directly challenge the juvenile court's findings under section 361.2.

Because father's concerns about a true finding on the count g-2 allegation against mother are addressed through the application of section 361.2, which gave him the opportunity to obtain placement of the children as a noncustodial parent, the juvenile

court did not err in finding count g-2 true.  Accordingly, we need not address the other counts or arguments because even if the evidence was insufficient to support the true findings on counts b-1 and g-1, or the juvenile court improperly amended count g-1, jurisdiction was properly taken under count g-2.

" 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the [child] if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.)  Jurisdiction over the children pursuant to section 300, subdivision (g) is therefore proper.

### III.    Amendment of Count G-1 According to Proof

Although we find jurisdiction proper under section 300, subdivision (g) based on the count g-2 allegation concerning mother, we will nonetheless address father's allegations that the juvenile court erred in amending count g-1 and finding that count true.  Count g-1 originally alleged the children were "left without any provision for support.  The father … is incarcerated and cannot arrange for the care of the children." At the jurisdiction hearing, the court amended count g-1 to add the following:  "[I]n that the criminal court has ordered that the children be protected from the father by issuing a criminal protective order in case F23903941; and further the father fired multiple shots into a residence in which the children were located, placing them in immediate danger."

In the third instance outlined above, section 300, subdivision (g), applies when, at the time of the jurisdiction hearing, the incarcerated parent cannot arrange care for the child's care.  (*In re S.D.* (2002) 99 Cal.App.4th 1068, 1077–1078.)  Incarceration, without more, cannot provide a basis for jurisdiction.  (*In re Noe F.* (2013) 213 Cal.App.4th 358, 366; see *In re S.D.*, at p. 1077 ["There is no 'Go to jail, lose your child' rule in

24.

California"].) Section 300, subdivision (g) "requires only that an incarcerated parent arrange adequately for the care of the child during the period of his or her incarceration." (*In re Monica C.* (1995) 31 Cal.App.4th 296, 305; *In re Isayah C.* (2004) 118 Cal.App.4th 684, 696 [there is no basis for jurisdiction "[i]f an incarcerated parent can make suitable arrangements for a child's care during his or her incarceration"].)

Father argues the juvenile court's sua sponte amendments to count g-1 deprived him of due process because: (1) the amendments were based on factual and legal theories not raised in the original petition, which deprived him of notice and a fair opportunity to be heard; and (2) by amending the allegations sua sponte the court assumed two roles: advocate and trier of fact, which deprived him of a fair trial before a neutral arbiter.

We agree with the department that father's failure to object on these grounds at the jurisdictional hearing forfeits this argument on appeal. (See *In re David H.* (2008) 165 Cal.App.4th 1626, 1640 [had the mother raised her objection to the sufficiency of the petition at the jurisdictional hearing, the court could have allowed the child protective agency to amend the petition to conform to the proof offered at the hearing]; *In re Wilford J.* (2005) 131 Cal.App.4th 742, 754 ["when a parent had the opportunity to present [a defect in notice] to the juvenile court and failed to do so, appellate courts routinely refuse to exercise their limited discretion to consider the matter on appeal"]; see also *In re A.A.*, *supra*, 203 Cal.App.4th at p. 606 [by failing to object at the dispositional hearing, mother forfeited argument that the juvenile court violated her constitutional rights by failing to consider placing her children with her].)

Here, father objected to the juvenile court's denial of his section 350, subdivision (c) motion on the ground that the court violated his due process rights by basing its denial on legal theories and facts that were not raised in the department's petitions. But he did not renew this objection when the court announced its amendment to the count g-1 allegation to conform to proof. "Enforcing the forfeiture rules requires parties to raise such issues in the juvenile court where they can be promptly remedied

25.

without undue prejudice to the interests of any of the parties involved." (*In re David H.*, *supra*, 165 Cal.App.4th at p.1640.)

Even assuming father did not forfeit his due process claim, the juvenile court did not violate father's due process rights by amending the petition according to proof. A juvenile court can amend a dependency petition to conform to the evidence received at the jurisdictional hearing to remedy immaterial variances between the petition and proof. (§ 348; Code Civ. Proc., § 470.) However, *material* amendments that mislead a party to his or her prejudice are not allowed. (Code Civ. Proc., §§ 469–470; *In re Andrew L.* (2011) 192 Cal.App.4th 683, 689 (*Andrew L.*).)

"Given the haste with which petitions are sometimes drafted, … the ability to amend according to proof plays an important role in the overall dependency scheme. If a variance between pleading and proof—to use the traditional term of art from the civil law [citation]—is so wide that it would, in effect, violate due process to allow the amendment, the court should, of course, refuse any such amendment. [¶] The basic rule from civil law, however, is that amendments to conform to proof are favored, and should not be denied unless the pleading as drafted prior to the proposed amendment would have misled the adversarial party to its prejudice." (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1041–1042 (*Jessica C.*), fn. omitted.)

"[T]he allowance of amendments to conform to the proof rests largely in the discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears that such discretion has been abused." (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31; see *Jessica C.*, *supra*, 93 Cal.App.4th at p. 1043.) "While the abuse of discretion standard gives the trial court substantial latitude, '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action …." ' [Citation.] 'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion.' " (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 119.)

An amendment is appropriate where the alleged facts supporting a basic allegation are changed to conform to proof. (See, e.g., *Jessica C.*, *supra*, 93 Cal.App.4th at p. 1042.) Thus, in *Jessica C.*, where the petition alleged the minor's father had "penetrated his daughter's vagina with his penis," but the minor testified he only "touched her vagina with his penis," amending the petition to conform to the minor's testimony was proper. (*Id.* at pp. 1040, 1042.) The appellate court in *Jessica C.* reasoned: "Here, it cannot be seriously maintained that [the father] would possibly have prepared his defense differently if the allegation had been that he had 'touched' his daughter's vagina with his penis, as distinct from 'penetrated.' The basic allegation was there, and any variance between 'touching' and 'penetrating' could not have misled him to his detriment. Both allegations are heinous, and entail the intimate violation of a child." (*Id.* at p. 1042.)

Similarly, in *Andrew L.*, the court held it was not prejudicial error to conform the petition to proof by striking entirely a section 300, subdivision (a) count, as well as the specific allegation of a diagnosis of a subdural hematoma caused by trauma in the subdivision (b) count, when the remaining subdivision (b) allegations that the child was at substantial risk of serious physical harm or illness were proved. (*Andrew L.*, *supra*, 192 Cal.App.4th at pp. 689–690.)

By contrast, in *In re G.B.* (2018) 28 Cal.App.5th 475, the juvenile court exceeded its authority to amend the petition to conform to proof where the amendments included allegations that "completely changed the grounds for establishing jurisdiction over [the minor]. Specifically, the court's allegations sought to establish jurisdiction over [the minor] under a different legal theory than the original allegations (emotional abuse versus sexual abuse); they named father as an offending parent even though he was nonoffending in the original petition; and they were based on a set of facts not at issue in the original allegations (father's alleged coaching of [the minor] to fabricate allegations against mother and her boyfriend versus the boyfriend's alleged sexual abuse and

27.

mother's failure to protect [the minor] against that abuse)." (*Id.* at p. 486.) The amendment was improper because it asserted allegations against the father based on a factual and legal theory not at issue in the original petition. (*Ibid.*)

Likewise, in *In re S.V.* (2022) 86 Cal.App.5th 1036, the juvenile court abused its discretion by amending the petition, which alleged jurisdiction should be taken under section 300, subdivision (d) based on sexual abuse by the father, to include an allegation against the nonoffending mother under section 300, subdivision (c), asserting facts and theories not alleged in the original petition. (*Id.* at pp. 1042, 1047, 1048–1049.) The court found minor's counsel's advocacy to conform the petition to include an emotional abuse allegation against the mother was insufficient to apprise her "that allegations were being asserted against her, or of the specific details of the allegations ultimately sustained by the juvenile court," as minor's counsel's proposed amendments differed from the juvenile court's amendment and the agency opposed the proposed amendment. (*Id.* at p. 1050.)

Here, the juvenile court's amendment did not violate father's right to due process. Before the amendment, the petitions alleged father was incarcerated and could not arrange for the children's care. In arguing in support of his motion to dismiss the petition and that jurisdiction should not be taken, father asserted he could make a suitable arrangement for the children's care despite the protective order by placing them with paternal grandparents. Father thus was aware that the protective order was an issue with respect to whether he could arrange for the children's care. The allegation that father placed the children in immediate danger when he fired multiple shots into a residence in which the children were located showed the basis for the protective order.

The protective order and the facts of the crime to which father pled no contest were attached to the department's reports. Adding allegations to count g-1 that there was a protective order and father had placed the children in danger simply provided context for the allegation that father could not arrange for the children's care. For that reason,

father's assertion that the amendments added a new and distinct basis for jurisdiction as to father fail—the issue remained whether father could make a plan of care for the children. The amendments did not allege a new basis for jurisdiction or assert a new factual or legal theory, as in the cases father relies on. We are satisfied, given the reports the department submitted, that father was on notice of the protective order and the evidence concerning his criminal case.

This brings us to father's additional argument that the juvenile court failed to act as a neutral arbiter when it crafted, asserted, and adjudicated jurisdiction allegations against him. Relying on *In re G.B.*, father contends the juvenile court assumed the dual roles of advocate and trier of fact when it amended the allegations to conform to proof. *In re G.B.* is readily distinguishable, as there, after dismissing the allegations against the offending parent, the court on its own motion crafted, asserted, and adjudicated "new allegations against a nonoffending parent based on a factual and legal theory not at issue in the original petition." (*In re G.B.*, *supra*, 28 Cal.App.5th at p. 487.) In contrast here, the juvenile court did not craft a new allegation against father based on a factual and legal theory that was not alleged in the petition; rather, the amendment added facts to show why father could not arrange for the children's care, which, as discussed *ante*, did not materially change the original allegation. We conclude the juvenile court did not violate father's due process right to a fair trial.

## IV.    Substantial Evidence Supports Count G-1

This leaves whether substantial evidence supports the juvenile court's finding that count g-1 is true. The evidence showed that father could not arrange for the children's care due to the protective order, as the protective order prohibited him from having contact with the children and obtaining the address or location of the children or their family members, caretakers, or guardians. Although father asserted that he could comply with the protective order while arranging care for the children, this was impossible given its terms. Moreover, paternal grandparents were not a suitable placement, as they were

29.

unlikely to protect the children from father since they did not see father as primarily at fault for the shooting even though he was the one who shot into the home and instead assigned equal blame to mother. Father does not identify any other relative he could place the children with and still comply with the protective order.

In sum, there was sufficient evidence to support the finding of jurisdiction under section 300, subdivision (g) as to both mother and father.[12]

### DISPOSITION

The petition for extraordinary writ is denied. The request for a stay of the section 366.26 hearing is denied. This court's opinion is final forthwith as to this court pursuant to rule 8.490(b)(2)(A).

---

[12] Since there is sufficient evidence to establish jurisdiction under section 300, subdivision (g), we also find the trial court properly denied father's request to dismiss the second amended petition pursuant to section 350, subdivision (c). (See *In re Eric H.* (1997) 54 Cal.App.4th 955, 968–969 ["Section 350(c), the equivalent of a motion for nonsuit, allows a parent to test the sufficiency of the Agency's evidence before presenting his or her case."].) Moreover, it is unnecessary to decide whether there is sufficient evidence to establish jurisdiction under section 300, subdivision (b).